## KOSBA v. BANK LINE, Limited, et al.
### No. 1777.

District Court, D. Maryland.

Jan. 7, 1931.

Joseph T. England and Julius F. Sandrock, both of Baltimore, Md., for libelant.

Janney, Ober, Slingluff & Williams, of Baltimore, Md., for libelees.

SOPER, District Judge.

The libelant in this case sues to recover for an injury received by him while leaving the steamship Forthbank, then at the dock at Sparrows Point in the port of Baltimore on February 1, 1930, about 5 o'clock in the afternoon. While descending a ladder, the only means of ingress and egress on the ship, he fell, either because he lost his balance or because the ladder slipped, and he then came into such violent contact with the side of the ship that he lacerated the little finger on his left hand and broke a bone in his right knee-joint.

An important consideration in determining the liability of the ship is the character of the business which led the libelant to go on board on the day of the accident. A player piano had been sent to the ship and deposited on the deck. Kosba went on board in order to remove the instrument from the deck and place it in the saloon where the officers could enjoy it. The piano was the personal purchase of the captain, which had been made during the stay of the ship at Baltimore. He not only purchased it with his own money, but paid the expenses of transporting it to the ship, and he also employed Kosba to take the instrument apart so that it might be carried through the narrow doors of the ship and set up in the officers' quarters.

The captain was assisted in the purchase of the piano and in securing Kosba's services by the secretary of the corporation, which was the agent of the ship. But the evidence

satisfies the court that the secretary was acting rather in a friendly way in assisting the captain to purchase the instrument and to have it properly installed than as the agent of the ship. The captain happened to say that he wanted to purchase such an instrument, and the secretary, having learned a short time before that such an instrument could be bought, brought the parties together. In short, the court concludes that Kosba went on board the ship for the personal convenience of the captain and not in the interest of the ship.

There is no evidence to indicate that the owners of the ship had any part in the transaction. The libelant's counsel suggest that the business of the ship was involved, because the piano was on deck and it was important to have it moved into the cabin before the ship sailed, and that, if it had not been removed and the ship's sailing had been delayed, a loss of approximately $800 per day would have been incurred; but the court does not find anything in the testimony to indicate that the ship would have stayed over had the piano not been placed in the cabin on the day of the accident.

A second important circumstance in the case is the manner in which the ladder was attached to the ship at the time that Kosba fell. The ship lay alongside the pier and was being loaded with cargo, and, as the work was nearly finished, she was about to sail. The ladder was approximately 30 feet long and extended from the pier to a distance of 7 to 10 feet above the deck of the ship. It rested at the upper end on the rail or deck, and was lashed at this end by ropes which were passed around the uprights of the ladder, and attached to the rail of the ship in such a way that the ladder was securely held and could not fall even when not supported at the bottom. But there was some play in the lashing, so that the ladder could move up and down with the tide or with the position of the ship as it settled in the water in the taking on of the cargo.

When Kosba descended the ladder, the foot of it was resting on a ledge 12 inches wide on the side of the pier, and was lodged against a stringer or log 12 inches square in cross section which ran lengthwise on top of the pier. Hence the angle between the side of the ship and the ladder was very sharp. It was more nearly vertical when he came off the ship than when he went on, for in the meantime certain railroad cars had been put on a track which ran parallel with the stringer, immediately adjacent thereto. Opposite the ladder on the pier at the time was a gondola car, which was of the usual height and had sides 3 feet high.

While Kosba was on the ship, some ladies, accompanied by officers of the ship, came to visit. At that time the ladder appears to have been in substantially the same position as it was when Kosba descended; that is to say, the foot of the ladder rested upon the ledge. The cars, however, were separated when the ladies came so that they could approach the foot of the ladder without going between the cars and the ship. When they left the ship, the cars had been replaced and they found that the easiest method was to descend the ladder to the car, then step upon the car, cross it, and descend upon the other side. The evidence also shows that a number of other persons, including a man just released from the hospital in a somewhat weakened condition, had gone up and down the ladder safely.

According to the testimony of the libelant, the accident happened in the following manner: He came down the ladder carrying in his right hand a small grip containing his tools. When he got about halfway down the ladder, he changed the grip from his right to his left hand, and handed it to some person who was on the pier between the cars and the ship, so that both hands might be used during the rest of the way down. The person who is said to have received the satchel has not been identified, and the libelant was not very certain in his recollection as to whether he changed the grip from one hand to another at this point in his descent. He says, however, that about this time, for some reason which he does not understand, the bottom of the ladder slipped from the pier towards the ship, whereupon he struck against the side of the ship and was injured.

The testimony of the only other eyewitness to the accident is different. This witness was a watchman on board the ship. He states that he was standing at the head of the ladder when the libelant descended; that when the libelant reached a point on the ladder between the side of the car and the side of the ship, he crowded his body between the ladder and the car, and pushed the ladder off the pier. The libelant is a bulky man, over 6 feet in height and two hundred and thirty pounds in weight.

It is hardly necessary to decide which version of the accident is correct. If the libelant's confused statement is accepted, it seems quite likely that he lost his balance when he changed his bag from one hand to

the other, and, in his fall, pulled the ladder with him. If so, his claim is without foundation in law because of the voluntary assumption on his part of the obvious danger of descending a ladder under the circumstances described. Miner v. Conn. River R. Co., 153 Mass. 398, 26 N. E. 994; Standard Oil Co. v. Titus, 187 Ky. 560, 219 S. W. 1077.

The only neglect of which the libelant complains is that the ship failed to secure the ladder at the bottom. It rested, as we have seen, against the stringer, so that it could not slip away from the ship; but it is said that in addition a cleat should have been placed between the edge of the pier and the foot of the ladder so as to prevent its slipping toward the ship. It does not appear that such a method is ordinarily employed, and the evidence shows that the ladder was safely used by divers persons. It may be assumed, however, that the absence of the cleat is some evidence of negligence on the part of the officers and the crew in placing the ladder for the use of the vessel. Nevertheless it does not follow that the libelant may recover. It is clear from the undisputed facts that his relation to the ship most favorably stated from his viewpoint was that of a licensee. The fact that he was the personal employee of the captain, if not known to him, could easily have been ascertained by inquiry. Indeed his pass to the ship indicated that he was to go aboard on private business. Certainly the ship's people did nothing to mislead him. Now the duty of an owner of a ship to a licensee on board is well settled. The general rule is that the owner shall not willfully or wantonly injure a licensee, or expose him to hidden perils, or fail to use due care to prevent injury to him after discovering that he is in danger. Duree v. Railroad (C. C. A.) 241 F. 454; The Sudbury (D. C.) 14 F.(2d) 533; The Silverado S. S. Co. v. Prendergast (C. C. A.) 31 F. (2d) 225; Swanson v. Luckenbach S. S. Co. (C. C. A.) 17 F.(2d) 735; Freeman v. United Fruit Co., 223 Mass. 300, 111 N. E. 789.

It follows that, even if the accident was caused by the slipping of the ladder either before or after the libelant reached the gondola car, there was no such negligence on the part of the ship as would constitute an infraction of the duty owed by her to the libelant. There was an absence of that complete indifference to consequences which distinguishes wrongs caused by wantonness and recklessness from torts arising from negligence.

The libel must be dismissed.