## CALANCHINI v. BLISS.
### No. 8206.

Circuit Court of Appeals, Ninth Circuit.

Feb. 8, 1937.

Albert E. Sheets, of Sacramento, Cal., and Marc F. Morrison, of Eureka, Cal., for appellant.

Charles A. Bliss, of Sacramento, Cal., and Marshall B. Woodworth, of San Francisco, Cal., for appellee.

Before WILBUR, DENMAN, and MATHEWS, Circuit Judges.

WILBUR, Circuit Judge.

A libel in personam was filed by appellee to recover damages because of the death of Ivor F. Torrey. The decedent was a passenger on board the speedboat Cayuga owned and operated by the appellant Calanchini, on the occasion when the deceased was drowned as a result of the capsizing of the boat.

The appellant had recently purchased the boat and had invited the members of a picnic party of the American Legion, held near the mouth of Eel river, to ride on his boat. Throughout the day this boat and two or three other boats, belonging to others, had been engaged in giving rides to members of the picnic. These rides were in the smooth waters of the Eel river and its tributaries. Toward the close of the afternoon, a new boat party was formed, and the appellant, somewhat against his inclination agreed to give the party a ride. The appellant testified that Louis Brown, who was active in promoting the pleasure

of the picnickers, requested him to take the party across the bar at the mouth of Eel river and into the open ocean, and that in response to this request, he ventured into the open sea, for about a half mile; that on his return when out about one quarter mile, the boat capsized. Nine persons were drowned. Eighteen persons were aboard. It is conceded that the rated capacity of the boat was ten. It is therefore admitted by the appellant that his boat was unseaworthy, when so overloaded. His defense is based upon several affirmative allegations: (1) That appellant was ignorant of the fact that more than ten persons were on board. (2) That the deceased was not invited aboard. (3) That the deceased assumed the risk due to the overloading of the boat, and of the trip into the open sea. (4) That the overturning was due to an act of God, because of the wholly unpredictable size of the wave which overturned the boat. (5) That the decedent was guilty of contributory negligence. (6) That the accident was unavoidable. The boat was a Baby Gar manufactured by Gar Wood, Inc. Its length was 28 feet; beam 7′ 2″; draft two feet one inch; weight two tons, maximum speed 40 miles per hour. The boat was decked over except for two open cockpits. The forward cockpit was covered by a "cab." The wheel, and control mechanism, were operated from this cockpit which contained seats for several passengers in addition to the man at the wheel. The 200-horsepower engine was housed under the deck in the space between the forward and after cockpits. The after cockpit contained one seat athwartships. There was no place for passengers other than in the seats in the two cockpits. At the time the boat capsized the seats were filled, except that there was room for one more passenger on the front seat, and there were two men seated or lying on top of the cab over the forward cockpit; one forward on deck, two seated with their backs against the after end of the cab, with legs extended aft on the hatch covering the engine, and two women were seated on deck on the edge of the after cockpit with their legs extended into it. There were several children in the boat.

The trial court found that the accident was not due to an act of God. The evidence supports this finding. The appellant testified that the sea was as calm as usual; that there was a small ground swell only, and that he did not know why the boat capsized.

The overloading alone is sufficient to fully account for the accident. Experts familiar with such boats testified that with such overloading, affecting, as it did the center of gravity of the boat, it was liable to capsize with the slightest provocation such as a shifting of the helm at high speed, and particularly liable to capsize when subjected to the action of waves, in the open sea, or upon the bar at the mouth of the river.

It must be plain that with so light a boat, with so small a draft, and so little freeboard the presence of eighteen persons aboard would seriously affect her stability, and that when seven of them were above the upper deck, two of them upon the top of the cab, that the danger of capsizing was greatly increased. Indeed, the appellant's claim is, in effect, that the danger was so obvious that the decedent must be held to have assumed the risk. There was no expert testimony as to the metacentric height of the boat, when empty or when loaded with ten people, nor is there any expert testimony as to the effect upon the metacentric height of a load of passengers distributed as this was. The experts who testified had wide experience in handling such boats in a seaway and agreed that the boat was likely to capsize in a seaway. Captain John W. Dreyer, a mariner with great experience in handling motorboats of the type of the Cayuga, testified in part as follows: "* * * I say it would not be safe to take ten people out [to sea] at any time, and with regard to eighteen I would consider myself a potential murderer if I took eighteen people outside. Absolutely." Garner J. Churchill, the officer in charge of the Humboldt Bay Coast Guard Station at Eureka, near the mouth of Eel river, testified that in his opinion, the motor boat would capsize in a seaway with eighteen people aboard and that even if the weight of eighteen persons, were in the form of lead on the bottom of the boat it would capsize because the bow of the boat would be submerged so deep that the sea would push the relatively light stern "forward and up", and that "the stern being pushed forward and up, naturally it is going to capsize the boat."

The appellant seeks to escape liability for the unseaworthiness of the overloaded motorboat because he claims that

he was ignorant of the fact that the boat had on board more than ten persons, as he was seated in the forward cockpit, and hence unable to see the men on top of the cab, the two men with their backs against the cab and the extra passengers dangling their feet in the after cockpit. The trial court found against this claim, and is supported in its conclusion by the testimony of one witness at least, Geo. Becker, who stated that Mr. Brown was on top of the boat [cab] at the time the appellant entered the forward cockpit at the dock. As both witnesses, the appellant and Geo. Becker, testified before the trial judge his finding upon this conflict is binding upon us; but were this not true, we cannot escape the conclusion that in either event it was negligence on the part of the appellant to take the boat out to sea, without ascertaining the number and position of his guests upon the boat, where the rated capacity of the boat was so limited, and its stability in a seaway so delicate. The appellant is an experienced boatman and was familiar with the conditions at the mouth of the Eel river and on and across the bar at its mouth.

If the decedent had been equally familiar with the boat and with local conditions it might well be argued that he assumed the risk by taking passage on the overloaded boat, or was guilty of contributory negligence; but he had no knowledge of nautical matters, no knowledge of the boat, except such as was apparent to any one, and was entirely unaware of the danger to himself and his little son who was drowned also. Moreover, there is nothing to show that the decedent knew the boat was going out into the open sea. It had not done so on any of its previous trips that day. The decedent had arrived at the picnic grounds at 3:30 p. m. and accepted the invitation for a boat ride extended to him by Brown. This was no assumption by decedent of a risk which he in no wise apprehended. He was not guilty of contributory negligence. The claim that the deceased was not invited aboard the boat for the trip, is based on the assumption that the appellant did not intend to overload the boat, and did not know that the decedent and others on the deck had come aboard. The invitation to Brown and his party was a general invitation, without any specification of numbers or persons. Brown invited the decedent, who took his place aboard in a conspicuous position. Assuming that the general invitation was subject to the implied limitation of the boat's rated capacity, in order to withdraw the express invitation it was necessary that the invitee be advised or informed of the implied limitation, or be expressly told that he was not invited. The finding of the trial court in favor of the appellee on this issue must be sustained.

The trial court found that the appellant was guilty of negligence in operating the boat on its attempted return, in that the boat was allowed to swerve toward the following sea, or swell, so that a second wave striking the boat slightly on her quarter, overturned it. This finding, if supported by the evidence, would sustain the award. We cannot say that this finding is not supported by the evidence except on the theory, that, as some of the experts testified, it was impossible to navigate the boat so overloaded, in a seaway without such a result. The boat would not answer her helm promptly because of the distribution of her load, and consequently the defective navigation was due to the unseaworthiness of the vessel rather than poor helmsmanship. In this view the negligent operation of the boat must be considered a result of the overload, rather than the mismanagement of the boat; but as we hold that the appellant was negligent in taking the boat into a seaway, in her overloaded condition, the question of whether or not the boat was negligently operated in a seaway becomes immaterial.

We conclude that the appellant was rightly held by the trial court to have been negligent in going to sea with an overloaded boat; that this negligence resulted in the death of Ivor F. Torrey, who was without fault, and that the appellee is entitled to recover for the loss caused by his death.

Decree affirmed.